# THE SUPREME COURT

OF

## THE STATE OF MISSOURI,

OCTOBER TERM, 1857, AT ST. LOUIS.

[CONTINUED FROM VOL. XXV.]

———————

REED, Plaintiff in Error, v. CONWAY, Defendant in Error.

1. A contract entered into, in behalf of the United States, by the surveyor general of Missouri and Illinois, with one of his deputy surveyors, for the surveying of the public lands, is the contract of the United States government and not of the surveyor general.
2. The surveyor general has no power, it seems, to remove one of his duly appointed deputy surveyors except for negligence or misconduct in office.
3. Since, however, the only duties of a deputy surveyor are to make surveys under special contracts, his removal, where he has no such contract, although wanton and without cause, would give him no cause of action against the surveyor general.
4. After the surveyor general has entered into a valid surveying contract with a deputy, the surveyor general has no right, without cause, to remove such deputy with a view to deprive him of the benefit of his conduct, or to annul the same.
5. Where, however, the surveyor general, in interfering with the deputy in the execution of his contract, acts in good faith and without malice, the fact that he acts unlawfully will not give to the deputy a cause of action against him. His acts must be malicious to render him liable.

2—VOL. XXVI.

*Error to St. Louis Circuit Court.*

*B. A. Hill,* for plaintiff in error.

I. The court acted improperly in turning the plaintiff out of court and refusing to let the jury pass upon the question of malice. The powers of the surveyor of Illinois and Missouri stand upon the acts of 1816 and 1796. He has power to engage a sufficient number of skillful surveyors as deputies, to cause the lands to be surveyed. He was but the recorder of the surveys and the delineator of the plats of surveys. He has no power to survey himself. He may therefore be regarded as the principal deputy, without any power to execute a survey himself. He was then the recording clerk of the deputy surveyors and of the commissioner of the general land office, and draftsman of the plats and surveys, with power to certify plats for evidence from his records. He was not required to exact any bond from the deputies; he was only empowered to fix their compensation. He had an annual salary and fees for recording and certifying. He has been confounded with the " surveyor general of Louisiana," who possessed more ample powers, but was subject to more restrictions. The name of " surveyor general" has been appropriated by this clerk of surveys under the act of March 3, 1831, and he erects himself into dictator, an irresponsible judge. Now, he has authority to engage skillful deputies, but no power to exact a bond. I am unable to find any case of removal. The cause of removal was negligence or misconduct only. There are no binding instructions that affect this question. The commissioner of the general land office assumed, on the 28th of July, 1831, to issue instructions under the act of March 3, 1831, to the surveyor of Illinois and Missouri. But although the commissioner of the general land office had power to control the surveys returned certified, upon proper appeal, he had no power to affix the bond to a contract not required by the acts of Congress of 1796 and 1816, and the original instructions of Oliver Wolcott of 1797. There is no objection to the commissioner directing certain rules to be ob-

served with regard to the surveys, but he can not fix a condition to a contract not required by act of Congress. The question here is whether the plaintiff was *engaged* by the surveyor, Silas Reed, to do the work done. The act does not require any written contract. Warren Reed had a commission as a deputy surveyor; had taken the oath, and had signed the contract for surveying the six townships on the 14th of April, and it was perfected the 14th of May, ten days before Silas Reed left the office, and mailed to Warren Reed at a distance of one hundred and seventy miles from St. Louis. This is evidence not only tending to show, but absolutely showing, that he was engaged to survey the six townships. The evidence also shows that Conway made the same contract with Warren Reed; told him to go on and complete the work on the 10th of October. Conway had no power of removal except for negligence or misconduct. Although the presumption is in favor of the proper exercise of such a discretion, yet, if it be shown to have been exercised corruptly and with malice to injure Reed, Conway is liable.

*Geyer* and *Krum & Harding*, for plaintiff in error.

I. This record does not present a case of the improper exercise of the discretion vested in the circuit court in refusing to set aside a nonsuit. The evidence does not establish any contract between the plaintiff and the United States as alleged. There was no contract completed before the defendant entered upon the duties of his office, and he did not assent to or sanction one afterwards. The plaintiff did not perform on his part the contract, which he alleges to have been made, so as to entitle himself to pay for the work he pretends to have performed. There is no evidence of any unlawful act on the part of the defendant, in refusing to sanction or execute the arrangement made by Silas Reed after his dismissal from office. Whenever the law vests any person with the power to do an act, and constitutes him a judge of the evidence on which the act may be done, he is, *quoad hoc*, a judge, and is exempt from responsibility in a civil action for the exercise of

his lawful discretion, however erroneous and whatever his motives. (Vanderhayden v. Young, 11 Johns. 150; Wilson v. Mayor of New York, 1 Denio, 599; 3 Denio, 120.)

RICHARDSON, Judge, delivered the opinion of the court.

The abstract of the pleadings, much of the evidence, and a reference to some of the acts of Congress and the regulations of the land department bearing on the questions in this case, are set forth in the report of the case in 20 Mo. 22. When the case was first before this court, the question mainly discussed, and the only one decided, was touching the liability of the defendant, assuming that the plaintiff had a lawful contract as described in the declaration, and that the defendant unlawfully interfered with it so as to deprive him of any benefit from it; and the judgment was reversed because the circuit court refused to instruct that the defendant was not liable unless he not only acted unlawfully but maliciously. It was decided that a ministerial officer, acting in a matter that requires the exercise of his judgment, is not liable in a civil action for any errors of judgment, unless he is prompted by malice or the purpose to oppress and harass the person injured by his conduct. We have been asked to review this decision, and to decide that a ministerial officer is exempt from responsibility in a civil action for the exercise of his lawful discretion however erroneous and whatever his motives may be; but, after consideration of the arguments of the respondent's counsel, and an examination of the authorities, it need only be said that we concur in the decision that has been made.

On the second trial the testimony on the part of the plaintiff was substantially the same as on the first; and on the close of the plaintiff's evidence, the court, at the instance of the defendant, gave instructions that took the case from the jury and forced the plaintiff to a nonsuit. The instructions are as follows: " 1. That there is no evidence of the completion of any contract between the plaintiff and Silas Reed, as

surveyor general of Illinois and Missouri, obligatory on the United States, and which the defendant, as successor of said Silas Reed, was bound to execute on the part of the United States. 2. There is no evidence of any contract made and entered into between the plaintiff and Silas Reed, as surveyor general of the states of Illinois and Missouri, conformable to the laws of the United States and the usages, rules and regulations of the department of the government thereof having charge and superintendence of the public lands. 3. That there is no proof before the jury that the plaintiff was legally authorized to claim the benefits of either of the contracts described in the declaration."

The instructions do not point to any particular omissions in the proof, nor indicate any particular propositions of law affecting the case, and it is therefore necessary for us to explore the whole bill of exceptions, which is very voluminous, and to examine all the laws, the regulations of the land department, and the rules of the surveyor of Illinois and Missouri, bearing on the subject.

The parol evidence was given chiefly by Silas Reed, who testified that he was surveyor of Illinois and Missouri from March, 1842, to May 24, 1845 ; that he had been informed by the commissioner of the general land office that, under the appropriation of the 3d of March, 1845, provision would be made for having a portion of the public lands in Missouri surveyed during the next fiscal year ; that on the 14th of April, 1845, he appointed the plaintiff a deputy United States surveyor, who took the oath of office as such and received a commission ; that the plaintiff was about to start to Dallas county, one hundred and seventy miles from St. Louis, for the purpose of executing a surveying contract, and, to obviate the necessity of returning to St. Louis, he signed the contract mentioned in the declaration—the date and numbers of the townships being left blank ; that he received a letter, which was produced, from the commissioner of the general land office, instructing him among other things to contract at once

for the surveying of the public lands, but not to contract for more than the apportionment of the appropriation to his district would cover. On the 10th of May, 1845, the contract was dated, the blanks filled, and then signed by the witness. The bond was signed by Edward James as surety, and he approved the security to the bond, and a day or two afterwards mailed to the plaintiff at Dallas county, with a letter of instructions, three sets of the contract and the bond. The object of sending the contract was to have the execution of it attested, and he thought the bond had not been signed by the plaintiff. The defendant took possession of the office on the 24th of May, 1845, and witness saw the duplicate and triplicate of the contract and the bond in the surveyor's office at St. Louis in July, 1845, and thought the execution of the contract and bond by the plaintiff was witnessed in the field. On the 10th of October, 1845, after the plaintiff had returned from Dallas county, the witness states that he had a conversation with the defendant respecting his brother's contract of May 10, in which the defendant said he was willing that the plaintiff should proceed with his contract, but insisted that the contract of the Messrs. James should be reduced, as he feared the contracts already made would exceed the appropriation. The parties were informed of the result of this interview, and on the 13th of October the plaintiff, the Messrs. James, and the witness, went to the defendant's office, who again insisted on a reduction of the James contract, but the witness heard nothing said respecting the contract of the plaintiff; and after this interview the witness saw the plaintiff go to Mr. Sprigg's desk, who attested the execution of the plaintiff's bond by the surety, and told the plaintiff that he must make oath to the contract, and thereupon the plaintiff went before a justice of the peace and made the affidavit endorsed on the contract. After the affidavit was made the contract and bond were handed to the witness to be delivered to defendant. On the 15th or 16th of October the plaintiff and the Messrs. James set out to perform their contracts,

and, on the same day after the witness had parted with them on the boat on which they had taken passage, he went to to the defendant's office for the purpose of delivering the contract and bond, but did not see him, but saw the original, or a copy of a letter the defendant had written to the commissioner, dated October 13th, in which he stated he had annulled the plaintiff's contract. He therefore did not then leave the contract and bond, but afterwards, on the 25th of October, sent them to the defendant by Maj. Anderson, and in a day or two afterwards they were returned to him by the defendant through the post-office. The plaintiff returned to St. Louis in February, 1846, and soon after tendered to the defendant the field notes of his survey.

Mr. Sprigg, a clerk in the surveyor's office, stated that the contract and bond were on the same sheet of paper, and were in the office on the 9th July, on which day he thought they were returned; that on the 13th of October the plaintiff was in the defendant's office, and when he came out of it to his desk he seemed pleased, and the witness supposed the difficulty about the contract had been settled; that he pointed out to the plaintiff the defects, which were, that there was no oath to the contract and no attesting witness to the signature of the surety in the bond; but he then witnessed the signature of the surety, who then signed or acknowledged his signature, and young James was the attesting witness to the signature of the plaintiff; that in Silas Reed's time as surveyor, a bond was required, but no oath. On the 29th of May, 1845, the defendant wrote to the plaintiff directing him to suspend operations under the contract of May 10th until further advised, and on the same day he wrote to the department, desiring to be furnished with copies of letters sent to his predecessor between certain dates, for the reason that it appeared eleven surveying contracts had been made for which he could find no authority in the office. He stated, in this letter to the commissioner, that he had suspended the eleven contracts of the 10th of May, and gave his reason therefor; to

which the commissioner replied, 10th of June, 1845, that the department assumed no authority to interfere with the contracts of deputies, but doubted the propriety of suspending their contracts. The defendant wrote to the plaintiff, October 17th, to consider the contract of May 10th as null and void.

The only acts of Congress that relate to this subject are the act of May 18, 1796, entitled an " An act for the sale of the lands of the United States in the territory north-west of the river Ohio" (Laws, Pub. Lands, part 1, p. 50)—the act of February 28, 1806, entitled " An act extending the powers of the surveyor general to the territory of Louisiana" (Laws, Pub. Lands, part 1, p. 132)—the act of April 29, 1816, entitled " An act to provide for the appointment of a surveyor of the public lands in the territories of Illinois and Missouri" (Laws, Pub. Lands, part 1, p. 278)—and the act of March 3d, 1831, entitled " An act to create the office of surveyor of public lands in Louisiana" (Laws, Public Lands, part 1, p. 489), which it will be proper to notice only so far as it furnished the material for the instructions framed on it by the commissioner of the general land office, July 28th, 1831. (Laws, Pub. Lands, part 2, p. 915.)

The act of 1796 created the office of surveyor general ; made it his duty to engage a sufficient number of skillful surveyors as his deputies, whom he should cause to survey and mark the unascertained lines, &c. ; gave him authority to administer to his deputies the necessary oaths upon their appointment, to frame regulations and instructions for their government, *and to remove them for negligence or misconduct in office*. By the act of 1806 the powers vested by law in the surveyor general were extended over the public lands in the territory of Louisiana, and it was made his duty to appoint a sufficient number of skillful surveyors as his deputies in said territory, one of whom, with the approbation of the secretary of the treasury, he should designate as his principal deputy ; and it was made the duty of the principal deputy,

thus appointed, to execute, or cause to be executed, by the other deputies such surveys as might thereafter be authorized by law, and should generally perform, in conformity with the regulations and instructions of the surveyor general, the duties imposed by law on the said surveyor general.

The office of the surveyor of the public lands in Illinois and Missouri was established by the act of April 29th, 1816, and has continued in force, without any modifications bearing on this case, ever since. This act provided that a surveyor of Illinois and Missouri should be appointed, whose duty it should be to engage a sufficient number of skillful surveyors as his deputies, and to cause so much of the public lands to be surveyed as the President should direct; to do and perform all such other acts in relation to such lands as the surveyor general was authorized and directed to do in relation to the same on the lands lying north of the river Ohio; and generally to do and perform all and singular the duties required by law to be performed by the principal deputy of the territory of Louisiana. This act devolved on the surveyor of Illinois and Missouri the same duties which had been prescribed for the surveyor general of the United States and the principal deputy for the territory of Louisiana. He has no authority to make surveys himself, but it is his duty to *cause* the surveys to be made by deputies whom he shall appoint, with power to make regulations for their government, and to remove them for negligence or misconduct in office. (Mr. Wirt's Opinion, 1 vol. Opinions of Attorneys General, 432.) The practice of causing the public surveys to be executed by deputies under contracts with them, at a fixed rate per mile, was commenced by General Putnam, the first surveyor general, in 1797, and having received the sanction of the government, has been followed ever since. The contract system secures the performance of the work undertaken by the deputy, whether on examination he finds it a hard or an easy job; whilst a deputy not bound by contract might resign at any time and abandon a survey after it is begun if he found

it more laborious than he had expected, and thus delay the public interests. No surveys are made but such as are executed by deputies and are generally made under specific contracts; and as there are no duties incident to the office of a deputy but that of surveying under contract, he has no salary, and, without a contract, has no power and no duties, but is a mere *locum tenens*, with the empty title of an office that secures nothing but the chance of obtaining a contract at the pleasure of his principal. The law that gives the surveyor authority to appoint deputies seems to deny him the power to remove them except for negligence or misconduct; and as the deputy, after he has once contracted to make a survey, can not retreat from the undertaking, no matter how arduous the labor, or unprofitable it may be, the limitation on the power of removal is wise and just. As the deputy can not abandon the work he undertakes to perform as soon as he tires of it, the other party to the contract ought not to repudiate it without lawful cause. The wanton removal of a deputy without a contract would be *damnum absque injuria;* for as there is no compensation annexed to his office there would be no appreciable injury. But it is not lawful, without cause, to remove a deputy with a view to deprive him of the benefit of a subsisting contract, or to annul a contract after the right is secured to perform it, or in the course of its execution.

The instructions from the commissioner of the general land office, of July 28th, 1831, to the surveyor general of Mississippi, direct that a bond, with approved security, shall be taken for the due execution of all surveying contracts, in the penalty of double the value of the contract, and that the surveys must be executed under the personal and immediate superintendence of the contractor. These instructions appear to have been suggested by the 4th section of the said act of March 3d, 1831; and though the act does not apply to Missouri, there can be no reason why the commissioner of the general land office, who has a superintending control over

the public surveys, could not incorporate its practical provisions into the regulations of the department, so far as they were applicable and not inconsistent with law. .The instructions were directed to the surveyor of Mississippi, but a duplicate copy of them was sent to the surveyor of Illinois and Missouri, and they became obligatory on the latter.

The summary of the law and regulations of the department may be stated to be, that the surveying of the public lands is done under written contracts with deputies, who are required to execute bonds with approved security for the due execution thereof; they must take an oath faithfully to discharge their duties ; they may be removed for negligence or misconduct, and their work must be done under their personal and immediate superintendence ; and, by the printed instructions of the surveyor at St. Louis, the deputy is required to return his work with an affidavit, at the foot of the field notes of each township, that the work has been executed pursuant to his contract, in conformity to the law and instructions; that he has regularly surveyed and subdivided the township into sections, and that the field notes are the true and correct notes of the survey as executed. The contract between the plaintiff and Silas Reed, who acted in his official capacity, was inoperative whilst it remained in blank ; but if the blanks were properly filled by the surveyor at St. Louis, and the contract was signed by him and then mailed to the plaintiff, who, after receiving it, adopted and returned it to the proper office, it was binding on the plaintiff, though it was in blank when he signed it. It was at least good as a proposition from Silas Reed as surveyor, which continued outstanding whilst he remained in office, and if accepted by the plaintiff in a reasonable time, became a contract. (2 Kent, 477.) And even admitting that it was essential that the plaintiff should have adopted the contract, after the blanks were filled, during the official term of Silas Reed, the instructions of the court are erroneous ; for the question was open to be tried by the jury, whether in fact the plaintiff had not received and adopted the contract before Silas Reed was removed.

But the contract, though signed by Silas Reed, was executed by him as a public officer and in behalf of the United States, and did not commit him to any personal liability; for, as was said in Hodgson v. Dexter, 1 Cranch, 363 : "Where a public agent acts in the line of his duty and by legal authority, his contracts, made on account of the government, are public and not personal ; they enure to the benefit of, and are obligatory on, the government, not the officer." And if the proposition to the plaintiff from the surveyor, as a public officer, and as the act of the government, was accepted in a reasonable time by the plaintiff, it became a contract that was binding on the plaintiff and the United States, although in the interval between the time it was sent and returned Silas Reed had been removed from office and the defendant appointed in his place.

If the security to the bond for the performance of the contract was approved by Silas Reed whilst he was in office, his approval was sufficient, at any rate until the plaintiff was notified that other security was required.

Before the 20th of June, 1845, we do not find that there was any regulation that required an oath to the contract, and the execution of the contract and bond to be attested by witnesses ; and though there is nothing in this record to show that such a regulation ever existed, it is proper to observe, in reference to the instructions of the commissioner of June 20, 1845, which were in evidence on the first trial and may be offered again, that they would not apply to this contract if it was completed before they were issued. The contract was obligatory on the plaintiff, and the bond was binding on the principal and his surety, though their signatures were not attested ; and if the papers were in proper form according to existing instructions, they would not be invalidated by subsequent instructions that did not affect their substance, especially if the requirements of the instructions of the 20th of June were complied with when they were brought to the plaintiff's notice.

The contract required the plaintiff to perform the work he engaged to do " under his own personal and immediate superintendence and not by sub-contract." This did not forbid him from employing assistants, for one man alone could not make the surveys, nor did it require him to be personally present all the time, for that would be almost physically impossible ; but as the law required the surveyor to employ *skillful* deputies, and *his* services were engaged, he was bound to devote his personal attention to the work, and so far be personally present and superintend its execution as to be capable of judging and certifying as to its correctness.

We give no opinion of course as to the weight of the evidence bearing on the questions raised by the instructions given by the court, but the instructions were erroneous because we think there was evidence tending to prove that there was a contract between the plaintiff and Silas Reed, as surveyor of Illinois and Missouri, obligatory on the United States, which the defendant ought to have respected, and which the plaintiff was legally authorized to claim the benefit of. But to entitle the plaintiff to a verdict the jury must find on satisfactory evidence, under proper instructions from the court, not only that there was a contract as laid in the declaration, and that the defendant unlawfully interfered with it, but that his conduct in the premises was stimulated by malice ; for though the defendant may have acted unwisely or unlawfully, yet if he acted according to his judgment of what was right, or from a desire to promote the public interests, he will not be liable.

The other judges concurring, the judgment will be reversed and the cause remanded.